# UNITED STATES DISTRICT COURT
for the
## EASTERN DISTRICT OF MASSACHUSETTS

DEBRA FELDMAN
13 Aurora Lane
Salem, MA 01970
(617) 957-5367
*Pro Se Counsel*

Debra Feldman
     Plaintiff

     v.

JUDGE DOUGLAS P. WOODLOCK,
NEWS CORPORATION,
TWENTIEH CENTURY FOX,
TWENTIEH CENTURY FOX TELEVISION,
TWENTIEH CENTURY FOX GROUP,
NBC UNIVERSAL, INC., KEVIN FALLS,
UNITED TALENT AGENCY,
Wm. MORRIS ENDEAVOR ENTERTAINMENT,
MARC KORMAN, SHONDA RHIMES,
DELUXE PICTURES INC, MARK GORDON,
GREG BERLANTI, MARC GUGGENHEIM,
AMERICAN BROADCASTING COMPANIES, INC,
TOUCHSTONE TELEVISION PRODUCTIONS,
THE WALT DISNEY COMPANY
FOLEY HOAG LLP, MICHAEL BOUDETT,
JEFFREY FOLLETT, ELISA NETHERCOTT,
PAUL BORK, McCARTER & ENGLISH, LLP
KARA ANN LYNCH, ERIC BELT
DAVIS WRIGHT TREMAINE LLP,
ELIZABETH McNAMARA, MONICA PA,
BROWN RUDNICK LLP, ELIZABETH RITVO,
STEVEN VEENEMA, THOMAS EVANS
ZELLE McDONOUGH & COHEN LLP,
AND DOES 1-75.
     Defendant(s)

**VERIFIED COMPLAINT
AND JURY DEMAND**

Civil Action No.
14-

**COMPLAINT FOR DEPRIVATION OF RIGHTS
FRAUD UPON THE COURT
JUDICIAL AND ATTORNEY MISCONDUCT
TO ENJOIN ENFORCEMENT OF A JUDGMENT**

Plaintiff Debra Feldman, proceeding *pro se,* complains of Defendants and hereby alleges:

## THE PARTIES

The Plaintiff

1.   Plaintiff DEBRA FELDMAN (hereafter FELDMAN) is an individual residing in Salem, Massachusetts. FELDMAN holds a BFA in fine and applied arts from the prestigious Rhode Island School of Design; a Masters in Information Science from Simmons College (specializing in research and writing); has taught writing at a Massachusetts college. Her production work has been featured on TV – *ER, Sex and the City,* and *Gilmore Girls.* Related, in that Feldman is subject to rigorous ethical standards, she is an Enrolled Agent and works closely with both IRS and the Tax Court.

The Defendants

2.   To forestall the predictable rerun of the defendants engaging in a needless and wasteful battle over jurisdiction and nexus, FELDMAN presents both in her statement of the defendants.

3.   JUDGE DOUGLAS P. WOODLOCK (hereafter WOODLOCK) is a Federal judge in Massachusetts. His address is not known to FELDMAN at this time, but he lives and works in Massachusetts and is subject to the jurisdiction of this court.

4.   NEWS CORPORATION (hereafter NEWS and the et.al. in DWT, et.al.) is a Delaware corporation with main offices at 1211 Avenue of the Americas, NY, NY. NEWS is in partnership with NBC-Universal and ABC-Disney (at hulu.com). Although NEWS does not have corporate offices in MA, as *single-parent* to Defendants 20th CENTURY FOX, 20th CENTURY FOX TELEVISION, and 20th CENTURY FOX GROUP and ultimate employer of FALLS, NEWS regularly works within MA and is subject to the jurisdiction of this Court.

5.   20th CENTURY FOX, 20th CENTURY FOX TELEVISION, and 20th CENTURY FOX

2

GROUP (hereafter NEWS and the *et.al.* in DWT, et.al.) all are *parented* by NEWS; all share offices at 10201 W. Pico Boulevard, Los Angeles, CA 90064 and share NEWS' NY offices as well (see above). Even without permanent offices in MA, these NEWS companies regularly and frequently work in MA and are subject to jurisdiction of this Court; *e.g.,*

| | | |
|---|---|---|
| *Bride Wars (2009)* | *The Practice (1997-2004)* | *So You Think You Can Dance (2009)* |
| *Fever Pitch (2005)* | *Stuck on You (2003)* | *Boston Legal (2004-2008)* |
| *Shallow Hal (2001)* | *The Crucible (1996))* | *St. Elsewhere (1982-1988)* |
| *Boston Public (2000)* | *Ex-Files – "Fire" (1993)* | *James at 16 (1977-1978)* |
| *House Sitter (1992)* | *Author! Author! (1982)* | *The Boston Strangler (1968)* |
| *Mermaids (1990)* | *The Paper Chase (1973)* | *13 Rue Madeleine (1947)* |
| *The Verdict (1982)* | *Knight and Day (2010)* | |

6. NBC-UNIVERSAL, INC. (hereafter NBC and the *et.al.* in DWT, et.al.) is a Delaware corporation with principal offices at 30 Rockerfeller Plaza, NY, NY 10112. NBC is in partnership with NEWS and ABC-Disney (at hulu.com). NBC regularly and frequently works within MA and is subject to the jurisdiction of this Court. Incomplete list:

| | | |
|---|---|---|
| *Jaws (1975)* | *Jaws: The Revenge (1987)* | *House Sitter (1992)* |
| *Jaws 2 (1978)* | *Losing It With Jillian (2010)* | *Cheers (1982-1993)* |
| *The Verdict (1982)* | *Friday Night Lights (2010)* | *Field of Dreams (1989)* |
| *The River Wild (1994)* | *St. Elsewhere (1982-1988)* | *A Beautiful Mind (2001)* |
| *Ted (2012)* | | |

7. KEVIN FALLS (hereafter FALLS, and part of the *et.al.* in DWT, et.al.) is an individual residing at 4114 Fulton Avenue, Sherman Oaks, California. Although FALLS does not have permanent residences in MA, he deliberately came to MA, regularly and frequently to work *(ie: Summer Catch)* and is subject to the personal jurisdiction of this Court.

8. UNITED TALENT AGENCY (hereafter UTA, and the et.al. in ZELLE, et.al.) is a talent management company with offices at 9560 Wilshire Blvd., Beverly Hills, CA 90212 (and others). Although UTA does not have permanent offices in MA, UTA regularly and frequently *"works in MA"* negotiating contracts for clients appearing at MA venues or works filmed in MA, and is subject to the jurisdiction of this Court; *e.g.,*

| | |
|---|---|
| Gwyneth Paltrow (Williamstown: 1981-1994) | Casey Affleck (1997-2007) |
| William Petersen – *Kennedy's of MA* (1990) | Jennifer Lopez – *The Governess (2009)* |
| James Gandolfine – *A Civil Action* (1998) | Harrison Ford – *Sabrina* (1995) |
| Justin Timberlake – *The Social Network (2009)* | Tim Daly – *Wings* 1990-1997 |
| (also) TD Banknorth Garden *(2003-2007)* | Gwen Stefani *(2005-2009)* |
| Kyra Sedgwick – *Ally McBeal (2002)* | Spenser Grammer – *Cheers* (1992) |
| Brooke Shields – *Furry Vengence (2010)* | *The Game Plan (2007)* |

*UTA Shows filmed in MA:*
    *Wife Swap*     *SuperNanny*         *Extreme Make-over Home Edition*

*UTA's MA contractors:*
| | |
|---|---|
| Bay Path College, Longmeadow, MA | United Rentals, Ludlow, MA |
| Certified Restoration Drycleaning Network | Homes for Our Troops, Taunton, MA |
| AllergyBuyersClub.com, Waltham, MA | AIS Inc., Hudson, MA 01749 |

James Fenton & Son General Contracting, Acton, MA

9. Wm. MORRIS ENDEAVOR ENTERTAINMENT (hereafter WME2, and part of the *et.al.* in, McCARTER, et.al.) is Delaware Corporation with offices at 9601 Wilshire Boulevard, 3rd Floor, Beverly Hills, CA 90210 (and others; *e.g.,* NY; Nashville; Miami Beach; and London). Although WME2 does not have permanent offices in MA, they regularly and frequently *"work in MA"* negotiating contracts for clients appearing at MA venues and is subject to the jurisdiction of this Court. Incomplete list:

| | | |
|---|---|---|
| Kevin Falls | Greg Berlanti | Marc Guggenheim |
| Ray Romano (2009) | Donna Summer (2008) | Smokey Robinson (2009) |
| Al Franken (2002) | Chita Rivera (1967-2007) | Michael Chiklis (2003-2004) |
| Leonard Nemoy (2010) | Carly Simon (1987-2007) | Gipsy Kings (2003-2009) |
| Joel Grey (1981) | Jane Alexander (1999) | Natalie Cole (pre-1972-2008) |
| Julie Andrews (2008) | Pearl Jam (1994-2006) | Olympia Dukakis (1998-2009) |
| Van Halen (1986-2007) | B.B. King (2008-2009) | Bernadette Peters (1982-2009) |
| Al Green (2008-2009) | Josh Groban (2004-2007) | |

10. MARC KORMAN (hereafter KORMAN, and part of the *et.al.* in, McCARTER, et.al.) is a former attorney who resides/resided at 1660 Queens Rd, Los Angeles, CA 90069. KORMAN is a managing partner and agent at Def. Wm. MORRIS ENDEAVOR ENTERTAINMENT (and former managing partner and agent at Def. UTA). Although

KORMAN does not reside in MA, he regularly and frequently *"works in MA"* negotiating contracts for clients appearing at MA venues and is subject to the jurisdiction of this Court.

11. SHONDA RHIMES (hereafter RHIMES, and part of the *et.al.* in both FOLEY and ABC, et.al.) is an individual whose address is/was 179 S. Hudson Ave., Los Angeles, CA 90004. Although RHIMES does not reside in MA, she regularly and frequently *"comes to MA"* to work with MA sources (*e.g.,* Mass General Hospital; Brigham & Women's Hospital) and is subject to the jurisdiction of this Court.

12. DELUXE PICTURE INC (hereafter DELUXE and part of the *et.al.* in both FOLEY and ABC, et.al.) is a California company located at 1990 S. Bundy Drive, Suite 200, Los Angeles, California 90025. Although DELUXE does not have permanent offices in MA, DELUXE regularly and frequently *"comes to MA"* to work with MA sources and employ MA based companies (*e.g.,* Mass General, Brigham & Women's; Mutressa Movies, LLC) and is subject to the jurisdiction of this Court.

13. MARK GORDON (hereafter GORDON, and part of the *et.al.* in both FOLEY and ABC, et.al.) is an individual whose address is not known to FELDMAN at this time. Although GORDON does not reside in MA (as head of Def. DELUXE) he regularly and frequently *"comes to MA"* to work with MA sources and employs MA based companies (*e.g.,* Mass General, Brigham & Women's, and NE Baptist Hospitals; Mutressa Movies, LLC) and is subject to the jurisdiction of this Court.

14. Defendant GREG BERLANTI (hereafter BERLANTI and part of the *et.al.* in FOLEY and ABC, et.al.) is an individual who resides/d at 8033 W. Sunset Blvd #9750, West Hollywood, California 90046. Although BERLANTI does not have a permanent residence in MA (as head of BERLANTI TV) he regularly and frequently works in MA (ie: *Dawson's Creek*

5

*(1998-2003)* and is subject to the jurisdiction of this Court.

15. MARC GUGGENHEIM (hereafter GUGGENHEIM and part of the *et.al.* in FOLEY and ABC, et.al.) is an individual and former MA attorney now residing at 6345 Balboa Blvd, Encino, California 91316. Although GUGGENHEIM no longer resides in MA, he specifically left his home state to live, work, and pay taxes in MA for at least 5 consecutive years; left MA; then deliberately returned regularly and frequently to work in MA *(e.g, The Practice)* and is subject to the jurisdiction of this Court.

16. AMERICAN BROADCASTING COMPANIES INC. (hereafter ABC, et.al. and part of the *et.al.* in FOLEY, et.al.) is wholly owned by Def. The Walt Disney Company.

17. TOUCHSTONE TELEVISION PRODUCTIONS (hereafter TOUCHSTONE and part of the *et.al.* in FOLEY and ABC, et.al.) is the material partnership of Def. ABC-Disney with non-defendants DreamWorks and LionsGate.

18. THE WALT DISNEY COMPANY (hereafter DISNEY and part of the *et.al.* in both FOLEY and ABC, et.al.) is a publicly traded Delaware corporation with principal offices at 500 S. Buena Vista Street. City, Burbank, CA 91521, which they share with both ABC and TOUCHSTONE. DISNEY also is in partnership with NEWS and NBC-Universal (at hulu.com). Although ABC, DISNEY and TOUCHSTONE do not have permanent offices in MA, they regularly and frequently work in MA under each of these names and are subject to the jurisdiction of this court; *e.g.*:

| *Chasing Life (2014)* | *Gone, Baby, Gone (2007) music preparation and distribution* | |
| *Gilded Lilys (2013)* | *Sabrina, the Teenage Witch (1996-2003)* | |
| *Mermaids (1990)* | *The Cider House Rules (1999) travel services* | |
| *The Game Plan (2007)* | *The Reincarnation of Peter Proud (1975)* | |
| *Oliver's Story (1978)* | *Boston Legal (2004-2008)* | *It's All Relative (2003-2004)* |
| *Charly (1968)* | *Park Street Under (1979)* | *Goodbye Columbus (1969)* |
| *Mermaids (1990)* | *The Good Mother (1988)* | *The Practice (1997-2004)* |
| *Surrogates (2009)* | *The Game Plan (2007)* | *Hatfields & McCoys (2013)* |
| *The Proposal (2009)* | *Spenser For Hire (1985-1988)* | |

19. FOLEY HOAG, LLP, (hereafter, FOLEY, et.al.) is a law firm headquartered in Boston, MA with offices at 155 Seaport Boulevard, Boston, MA 02210 (among others). FOLEY conducts business in MA district and is subject to the jurisdiction of this court.

20. Michael P. BOUDETT, (BBO# 558757); Jeffrey S. FOLLETT, (BBO# 564337); Paul BORK, (BBO# 541815); Elisa K. NETHERCOTT, (BBO# 663656) are partners and/or associates at FOLEY (and hereafter, are part of the *et.al.* in FOLEY, et.al.). Their addresses are not known to FELDMAN at this time, but each lives and/or works in MA and is subject to the jurisdiction of this court.

21. McCARTER & ENGLISH, LLP (hereafter, McCARTER, et.al.) is a Massachusetts law firm headquartered in Newark, NJ. McCARTER conducts business at offices located at 265 Franklin Street, Boston, MA and is subject to the jurisdiction of this court.

22. KARA LYNCH (BBO # 659920) and ERIK BELT (BBO#558620) are partners and/or associates at McCARTER (and hereafter, are part of the *et.al.* in McCARTER et.al.). Their addresses are not known to FELDMAN at this time, but each lives and/or works in MA and is subject to the jurisdiction of this court.

23. DAVIS WRIGHT TREMAINE LLP, (hereafter, DWT, et.al.) is a law firm headquartered in Seattle WA, with offices at 1633 Broadway, New York, NY 10019-6708 (among others). For years, DWT voluntarily *'worked in MA' (pro hac vice)* and is subject the jurisdiction of this court.

24. ELIZABETH McNAMARA (EM 1987) is a partner at DWT and MONICA PA (MP3307) is an associate at DWT (and hereafter, are part of the *et.al.* in DWT, et.al.). Their addresses are not known to FELDMAN at this time. For years, each voluntarily *'worked in MA' (pro hac vice)* and each is subject to the jurisdiction of this court.

25. BROWN RUDNICK LLP (hereafter BR, and part of the *et.al.* in DWT, et.al.) is a Massachusetts law firm, with offices at One Financial Center Boston, MA 02111 (among others). BR conducts business within in MA and is subjec*t* to the jurisdiction of this court.

26. ELIZABETH RITVO is a partner at BR and STEVEN VEENEMA is an associate at BR (hereafter, are part of the *et.al.* in DWT, et.al.) Their addresses are not known to FELDMAN at this time, but each lives and/or works in MA and is subject to the jurisdiction of this court.

27. THOMAS EVANS (hereafter, is the *et.al.* in ZELLE, et.al.) is an associate at ZELLE. His address is not known to FELDMAN at this time, but he lives and/or works in MA and is subject to the jurisdiction of this court.

28. ZELLE McDONOUGH & COHEN LLP (hereafter, ZELLE, et.al.) is a Massachusetts law firm, with offices at 101 Federal Street, 14th Floor, Boston, MA 02110. ZELLE conducts business within MA and is subject to the jurisdiction of this court.

29. Upon information and belief, Defendants Does 1 through 20 are individuals, companies, their officers, managing members/partners, agencies and other related entities, or other managing agents of one or more of the defendant organizations that are (or were) conscious, dominant and active forces behind the wrongful acts complained of and, accordingly, are liable directly or indirectly for the harms alleged herein. Defendant Does 1-20 are transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

30. For purposes of this Verified Complaint, the above-described defendants may be referenced collectively as the "Defendants".

## JURISDICTION AND VENUE

31. This court properly has subject matter jurisdiction under 28 USC § 1332 because diversity of citizenship exists between the parties and the amount of controversy exceeds $75,000.

32. Subject Matter Jurisdiction of this Court is based on 42 USC § 1983; the Federal Rules of Civil Procedure; and United States laws governing deprivation of Constitutional rights and fraud upon the Federal courts pursuant to U.S.C.

33. Supplemental jurisdiction of additional claims falls under 28 U.S.C. § 1367, because such claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

34. Venue for this action is proper in this district, pursuant to the Judiciary and Judicial Procedure Laws of the United States, 28 U.S.C. §§ 1391 and 1400 in that the Defendants are doing business in this District.

## STATEMENT OF THE CASE

35. "Before [this] court is a case of [egregious mis]conduct by [] member[s] of our Bar [and judiciary] that involves not only a pattern of dishonesty and lying, but blatant fabrication and [the knowing] creation of evidence" that deprived FELDMAN of her Constitutional rights.

*In re Goffe, 641 A. 2d 458, 460 (DC: 1994); see also Matter of Goffe, 209 AD 2d 124 (NY: 1995) citing DR 1-102(A)(4) conduct involving dishonesty, fraud, deceit and misrepresentation; DR 1-102(A)(5) conduct prejudicial to the administration of justice; DR 7-102(A)(4) proffering fabricated evidence and/or knowing use of perjured evidence or false testimony – Code of Professional Responsibility)*

36. FELDMAN's complaint is not simply that the proceedings left something to be desired; she contends that defendants improperly were granted judgment as WOODLOCK relied directly on evidence that he manufactured himself. *("judgment obtained directly by fraud [] not merely founded on a fraudulent instrument," Throckmorton (infra) at 66)*.

37. As is clear *infra*, the defendants (among which are a judge, 4 law firms, and not fewer than 14 counsel) engaged in a *scheme* of material fraud that deprived an unrepresented plaintiff of her most basic civil right – a fair trial (as opposed to a perfect trial). *(U.S. v. Pisani 772 F. 2d*

9

*397, 402 (2nd Cir. 1985); (People v. Snow, 132 Cal.Rptr. 2d 271, 289, 65 P. 3d 749 (2003)).*

38. "The record before us reveals evidence from which a jury could find that [WOODLOCK helped] prepare[ a] false report and [granted dismissal] predicated on evidence [that he] ... manufactured [or falsely corroborated]. [The] larger issue raised by this case [is] that [when judges and attorneys] lie while acting in their official capacity, they also violate the public trust [as when] our Court appears to endorse such official misconduct [it] weaken[s] the public's respect for the administration of justice." *(Ricciuti v. NYC Transit Authority, 124 F. 3d 123 (2nd Cir. 1997))*

39. While the defendants in *Feldman v. Fox* withheld material evidence, their counsel manufactured for them *'facts'* and court events that verifiably do not exist. They also never told *"the whole truth"* about anything – *e.g.,* presented an *elite phrase* from FELDMAN's book review as if it were the entire review *(Chambers v. Nasco, 501 US 32, 35 (S.Ct. 1991)):*

   DWT, et.al.: *"The blurb in the front of the book ... describes An Ordinary Hero as "conveying the physical landscape of wartime Vietnam.""* [Dkt. 53, at 8]

   Actual "blurb": *"An Ordinary Hero is a well-crafted, cleverly plotted story [with] in-country scenes [that] work well in conveying the physical landscape of wartime Vietnam and [the] emotional landscapes of [Feldman's] characters."*

40. McCARTER, et.al. were so bent on fabrication that they invented alleged *facts* that are not even particularly material and would be undone simply by reading the Table of Contents for FELDMAN's Appx. [Dkt. 00116186275, at 2-3] *(Rule 3.4(e))*:

   *e.g., "The appendix is divided into sections, each one starting with page 1."*
   [Dkt. 00116181650, n.1]

41. And, McCARTER, et.al. insistence that the defendants *'operate'* in CA is fraud by non-disclosure. While it is technically true, it falsely insinuates they *"operate"* exclusively in CA.

   *e.g., "busy Hollywood writers, agents, and executives operating three thousand miles away from [FELDMAN's] Salem home" [Dkt. 97, at 2] (emphasis added)*

Meantime, McCARTER's own clients (and others) have corporate offices 216 miles south of Boston and NEWS has corporate offices 180 miles from FELDMAN's front door. *(Allen v. Devon Energy, 01-09-00643-cv, Pt. A., (2011); Allen v. Devon, 367 SW 3d 355, 371 (2012)).*

42. Per ¶¶4-18 *(supra)* none of the defendants are "too far away" to *"operate"* in Massachusetts. And, per the wealth of evidence available to This Court from 700+ subsequent courts, NEWS never was "too busy" to invade computers, phones, and email that are not their own.

43. Even when caught in their numerous lies [Pltf. Ex E][Dkt. 113/115] instant defendants (who are counsel) twisted FELDMAN's objections [Dkt. 104][Dkt. 120, at 3, and n.1] and persisted that their misleading claims are accurate exactly as stated [Dkt. 141, n.2] (see: **Pt. XII-A,** *infra*) *(In re Huchinson, 534 A. 2d 919, 921 (1987)).*

44. Misconduct was so pervasive that no rational jury could find the proceeding in *Feldman v. Fox* fair on any level. FELDMAN urges this court to focus on: (1) the severity of the misconduct; (2) its repetitive nature; (3) its impact on the critical issues; (4) the fact that no curative measures ever were implemented; and (5) the consequences suffered by FELDMAN.

45. While each instance of judicial and attorney misconduct may not (individually) require reversal, FELDMAN urges This Court to consider them as an aggregate as "the total effect …cast[s] such a serious doubt on the fairness of the [proceeding] that the [judgment] must be reversed." *(U.S. v. Young, 470 US 1, 12 (S.Ct. 1985); U.S. v. Guglielmini, 384 F. 2d 602, 607 (2nd Cir. 1967); State v. Williams, 204 Conn. 523, 540, 547-550 (Conn: S.Ct. 1987); Cobige v. City of Chicago, 752 F. Supp. 2d 860, 864 (2010).*

## *I. Rule 8(a)*

46. Counsel entered the case with a conflict of interest which infected the entire proceeding however WOODLOCK and the panel prejudicially ignored it *(Canon 3(B)(3)(b))*. Second, the defendants knowingly used other courts to conceal evidence material to FELDMAN

claims, which orchestrated her alleged *"failure"* to state her claim. Third, WOODLOCK injected himself into the proceeding as a complaining witness, entering into the judgment material facts that he and his co-defendants manufactured just for court (apparently) *divining* them from thin air [Chart #4]. Five, (at appeal) DWT, et.al. invented a *'thorough comparison'* of over 200 items that never were given to WOODLOCK, to prevent any actual comparison of the items from ever taking place, by etc., etc. The result of these (and other harms) was a gross miscarriage of justice that stripped FELDMAN of her every civil right.

47. Instantly, is but an *overview* of the most flagrant harms and deprivation of FELDMAN's rights as presenting every aspect of them proved page-count prohibitive. By example, even a cursory debunking of DWT, et.al. fabrications required 16 single-spaced pages (±) even as a chart [Chart #4] therefore FELDMAN turns to Judge Rendell *(Alston v. Parker, infra)* and the Supreme Court's rejection of a fact-pleading requirement for civil rights complaints.

48. Should This Court require the entire list and/or even more detailed facts, then FELDMAN moves now to make more definite statements on any point/points that remain in question – see: *Rule 12(e) (Alston v. Parker, 363 F. 3d 229, 233, and n.6 (3rd Cir. 2004)).*

## II.    Misconduct – Conflict of interest

49. FELDMAN consulted with attorneys at FOLEY multiple times and presented this claim to WOODLOCK [Dkt. 80/82, at 2] who failed even to address it. Although he had another opportunity at reconsideration [Dkt. 136; 137; 137-1-3] and FELDMAN presented a more detailed account on Motion [Dkt. 165, at 24-25] (inclusive of her prior consultations with McCARTER) and no party challenged FELDMAN's claim in the district, WOODLOCK failed a second time even to address it which is "below an[y] objective standard of reasonable effectiveness," as FOLEY and McCARTER's own 2009 phone records (used to charge back

12

clients) easily confirm FELDMAN's claim. *(Sociedad Espanola v. NLRB, 414 F. 3d 158, 163 (1st Cir. 2005); Cumberland Farms v. NLRB, 984 F. 2d 556, 560 (1st Cir. 1993)).*

50. Even as a prospective client, FOLEY and McCARTER were prohibited from undoing FELDMAN by using against her information they gleaned directly from her during consultations with her – meaning that WOODLOCK's failure to investigate "may in fact be so severe [a failure] as to permit [the] infer[ence of] prejudice" and "discriminatory motive" *(Id.)*

*ABA Rule 1.9(a-b)(2) – a lawyer or firm shall not represent a client in the same matter in which the lawyer or firm formerly acquired information that was material to the matter, unless the original client gives informed consent, in writing.*

  *ABA Rule 1.10 – a lawyer associated in a firm shall not knowingly represent a client when any of them practicing alone would be prohibited from doing so.*

  *ABA Rule 1.18 – a lawyer is prohibited from representing another client (in the same matter) with interests adverse to those of his prospective client when the lawyer has received information from the prospective client that could be significantly harmful if used in the matter.*

51. Where FOLEY and McCARTER clearly were on notice to retain their 2009 phone records beyond their own need for them, destroying or disposing of them is willful destruction of material evidence to preserve their harm to FELDMAN. *(Rule 3.4, Comment [2])*

52. FELDMAN re-presented the identical claim at appeal. Yet again, McCARTER never challenged. FOLEY responded with a lie – that FELDMAN's claim was "new" – and indignation that amounts to puffery or a refusal to answer (rather than a denial):

   *"Appellant attempts to make new factual allegations ... These claims are ... unworthy of rebuttal." [Dkt. 00116353024, at 7]*

53. The panel's equal failure to investigate preserved FOLEY's lie and harm to FELDMAN.

## III.   Concealing Evidence

### A. Background

54. *"Cliff-Notes"* version: FELDMAN claimed, *inter alia,* that: (a) one or more defendants hire digital invaders (hackers) within a book publishing forum; (b) the same or other of the

13

defendants are guilty of (or complicit in) computer, phone and email invasion; and (c) the
defendants are joined by a sufficient number of material partnerships that easily enable all to
share what any one of them acquired, no matter which of them was the actual guilty party.

55. Although FELDMAN erroneously suspected KORMAN as nexus and NEWS as 3rd party
infringer, she is no less correct because NEWS is nexus and KORMAN the 3rd party infringer.

## B. Concealed Evidence

56. The chronology of events that culminated in FELDMAN's alleged failure to state a claim of
digital invasion is important. *(Damiani v. RI Hospital, 704 F.2d 12, 13 (1st Cir. 1983);
corrupt intent, U.S. v. Valenci-Copete, 792 F. 2d 4, 7 (1st Cir. 1986))*

57. In 2002 (as single-parent to NDS Group) NEWS was a principal party to *EchoStar v. NDS
Group* after NEWS' book publishing arm (HarperCollins) sought out and hired infamous
hacker Christopher Tarnovsky (and others) to which Tarnovsky testified in open court.

58. On July 19, 2004 (as single parent to News America) NEWS became a principal party to
*Floorgraphics v. NEWS (hereafter, Floorgraphics).* On Aug. 24, 2007 NEWS took effective
(if not actual) receipt of *Floorgraphics* Dkt. 150-2 – the sworn statement of computer expert
Luke Cats – attesting that NEWS habitually (if not ritually) uses their own computers (*e.g.,*
IP 208.253.150.1) in their own corporate headquarters (in Wilton, CT) to invade U.S.
computers 115 miles to their south *(Rule 406)* making it entirely likely they invade
computers to their north (including FELDMAN's 180 miles to their north):

> *"at least 49 different occasions ... sometimes more than once in a day"*
> [*Floorgraphics,* Dkt. 150-2, at 5-6 and at 9-10]

59. On Dec. 10, 2007, FELDMAN advised NEWS (via FALLS and FOX) that she intended to be
a future plaintiff. Although NEWS scrambled to suppress Dkt. 150-2, to deprive all future
plaintiffs from citing it, NEWS' motion was denied on Feb. 5, 2008 *(Floorgraphics, 546 F.*

14

*Supp. 2d 155 (2008))*.

60. On March 9, 2009 (at approx. 12:15 PM) FELDMAN began typing her Cplt.

61. In the wee-hours of Mar. 9, 2009 NEWS settled *Floorgraphics* ($29.5 million) which

    *conveniently sequestered* the document NEWS had failed to suppress – Dkt. 150-2.

62. With Tarnovsky's testimony and Dkt. 150-2 *'safely concealed'* in the Federal courts – CA and

    NJ, respectively – (where FELDMAN was unlikely to find them on her own) on July 31,

    2009, NEWS began 3 years of insisting that this evidence does not exist:

    *"specifically computer hacking ... does not rise to the level of "plausibility" [Dkt. 53, at 2, 5]*
    *"... that defendants ... hack into computers ... [is not] plausible on its face [Dkt. 104, at 2]*
    *"she is relying on an "illogical scenario"" [Dkt. 104, at 3]*

    *"Feldman failed ... to provide any evidence of such activity by the Fox Defendants*
    *[Dkt. 00106353397, at 16] ... "Plaintiff failed to make any plausible allegations of "hacking"*
    *... [and] fails to provide any "evidence" of such activity by the Fox defendants." [Dkt. 162, at 5]*

    *"Feldman's ... "hacking" ... allegation (... would be criminal activity, if true,*
    *which it is not) ... [Dkt. 53, at 12] (all emphasis added).*

63. Not only did the DWT, et.al. *list* of false denials "have the effect of representing to the [court]

    that the evidence does not exist" it insinuates that no amount of discovery ever could prove

    otherwise. *(U.S. v. Bagley, 473 US 667, 682-683, (S.Ct. 1985)).*

    *"The parties have not engaged in any discovery, nor is any necessary ...    [Dkt. 53, at 5]*
    *"[N]either discovery nor expert testimony is needed or even appropriate" [Dkt. 53, at 18]*
    *[see also: Dkt. 00116181721, at 34].*

64. And, although DTW, et.al. also insisted FELDMAN *"failed"* to state a claim, as is obvious

    (above) "the[ir] 12(b)(6) motions were replete with defenses that responded to claims the[y]

    discerned in [her] complaint." *(Alston v. Parker, 363 F. 3d 229, 234 (3rd Cir. 2004)).*

65. Clearly, NEWS was in receipt of Tarnovsky's testimony and Dkt. 150-2. Just as clearly, these

    items are non-privileged public documents and relevant to FELDMAN's case in that

    (together) they confirm every facet of her claim of computer and phone line invasion.

66. Although under *Rule 26(b)(1)* NEWS was obliged to share these items with FELDMAN,

DWT, McNAMARA and PA aided NEWS in concealing them from FELDMAN and literally

orchestrated her *alleged failure* to provide evidence that NEWS invades computer *(Rule*

*60(b)(3) 'Fed.R.Civ.P.) (ABA Rule 3.4(a)).*

67. Where not having Tarnovsky's testimony and *Floorgrahics* Dkt. 150-2 was sufficient to keep

FELDMAN out of court, surely having them would have stated her claim of computer

invasion, meaning that "lack of discovery was [] the only real barrier blocking [FELDMAN's]

path to relief.*" (Alston, at 232)*

> *"Rule 26(b)(1) provides that a party may "obtain discovery regarding any
> matter, not privileged, which is relevant to ... the pending action" (Seattle
> Times v. Rhinehart, 467 US 20, 29-30 (S.Ct. 1984)).*

> *"the first element of the tort of misrepresentation [is] that a party make a false
> representation with the knowledge of its falsity." (Damon v. Sun, 87 F. 3d 1467,
> 1485 (1st Cir. 1996), seeing: Barrett, 190 N.E. 2d 867, 868 (Mass: SJC (1963)).*

### C. Compounding the harm

68. Under *Rules 401* and *406 (Fed.R.Ev.)* NEWS' habitual computer invasion had probative

value and was entirely relevant to FELDMAN's claim of computer invasion.

> *"Rule 401. "Relevant Evidence"* – *evidence having a tendency to make the existence
> of any fact that is of consequence to the determination of the action more probable
> or less probable than it would be without the evidence."*

> *"Rule 406. Habit; Routine Practice* – *Evidence of the habit [] or of the routine
> practice of an organization, whether corroborated or not and regardless of the
> presence of eyewitnesses, is relevant to prove that the conduct of the [] organization
> on a particular occasion was in conformity with the[ir] habit or routine practice."*

69. And yet, McCARTER, et.al. "act[ed] not as advocates, but as a complaining witnesses"

suggesting their intimate knowledge of NEWS computer hacking campaign in the U.S.:

> *"What other people did in a different matter is irrelevant to Feldman's
> claims here."* [Dkt. 119-2, at 3].

16

*(Spivey v. Robertson, 197 F.3d 772, 776 (1999) seeing Kalina, 552 US 118, 118 (S.Ct. 502, 139 L.Ed. 2d 471 (1997))*

70. On Motion; FOLEY, et.al. jumped in as complaining witnesses – misdirecting WOODLOCK

to an *elite selection* of NEWS' digital crimes and away from *Floorgraphics* Dkt. 150-2:

*"Plaintiff's purported "new evidence" contains <u>no evidence at all</u>, but consists of inadmissible news reports about the hacking of cellular phone voice mails by the now-defunct British tabloid newspaper, <u>the News of the World</u>.        [Dkt. 162, at 5]*

WOODLOCK's silence in his denial presumes he accepted this as NEWS' *only* digital crimes,

when evidence in 700+ subsequent cases confirm it is systemic and rampant throughout any

number of NEWS' businesses *(e.g.: Ian Hurst v. NEWS)*

71. Voluntarily or by coercion, WOODLOCK failed even to acknowledge FELDMAN's claim

that NEWS was using other Federal courts to conceal evidence material to her claims and

denied her Motion without comment or ever investigating the merits of her claim, which

undermines confidence in the outcome of the proceeding in *Feldman v. Fox ("deficient*

*performance" Williams v. Taylor, 529 US 362, 391 (S.Ct. 2000); Argencourt v. US, 78 F. 3d*

*14, 16 (1st Cir. 1996)):*

#### FELDMAN:

*"Withholding evidence is a sufficiently bad act (Rule 405). Lying to the court that such evidence even exists [and] [u]sing the courts to conceal evidence in one case, to keep that same evidence from seeing light of day in another case, is not protected by the rule of law (Rule 60(b)(3)) and may be sufficient for the court to set aside its own judgment. "* [Dkt. 157][Dkt. 165, at 4].

### IV.   WOODLOCK as complaining witness (non-judicial capacity)

72. The three presumptions of judgment fact are that: (1) they are material; (2) the court relied on

them; and (most importantly) (3) they were derived from an *underlined_authenticated* source found

in the record.

*A. "Complaining" For the Defendants (see: Feldman, at 360, 361 and 362.)*

73. The individual defendants (save FALLS) took an unrestricted opportunity to declare their exact participation in the infringing works [Dkts. 46-48; Dkt. 50].

74. Where WOODLOCK did not recues, it must be presumed that he was not involved (in any way) in any infringing TV show; that he did not know any defendant personally; and that he was not in any position to express more knowledge of the defendants than the defendants had of themselves. *(Batra v. Wolf, 2010 NY Slip Op 52400, Pt II, ¶6 (2010)).*

75. Although FALLS (himself) made no claim at all, WOODLOCK *complained* for him:

   *"Kevin Falls created and produced the series ... Journeyman" (at 360)*

76. BERLANTI and GUGGENHEIM each declared that they merely were *"involved in creating Eli Stone"* but offered nothing as to specific roles (if any) [Dkt. 46, ¶3][Dkt. 47, ¶3]. And yet, (from the single word *"involved"*) WOODLOCK *divined* that both of these men specifically were that *"series creators, writers and executive producers." (at 362)*

77. GORDON similarly declared that he merely is *"involved in creating Grey's Anatomy and Private Practice"* [Dkt. 48, ¶3]. Again (from the single word *"involved"*) WOODLOCK *divined* that he specifically is "*the executive producer ... of both series" (Feldman, at 361).*

78. RHIMES deliberately excluded all roles save those to which she specifically attested [Dkt. 50 ¶3] and yet WOODLOCK added for her the role of *"head writer". (at 361)*

79. Even assuming *arguendo* that WOODLOCK's *"facts"* are accurate, he cannot point to a source anywhere in the record. Where he also never deposed these 5 defendants, he invited the panel to conclude he had *personal* knowledge of them and thus was required to recues *(Berger v. United States, 295 US 78, 88 (S.Ct. 1935))* therefore the material question is:

   *What is the source of WOODLOCK's intimate knowledge and why has the source of it been such a closely guarded secret for nearly 4 years?*

80. This Court must recognize the critical distinction between WOODLOCK's protected *"thought process"* vs. standing as a character witness for defendants he does not know and entering (into a judgment) *unauthenticated* facts he *divined* from thin air (or, more likely, acquired *ex parte*).

> *Canon 2(B): A judge should not testify voluntarily as a character witness – neither in his own court nor in his published ruling. A judge's testimony (as a character witness) injects the prestige of the judicial office into the proceeding and may be perceived as an official testimonial.*

81. WOODLOCK's *'secret maneuverings'* deliberately withheld the source of evidence upon which he relied – "kept [FELDMAN and the panel] in ignorance" *(Throckmorton, 98 US 61, 66 (S.Ct. 1878))*. While WOODLOCK can keep his *"thought process"* a secret, FELDMAN still may call him to identify the *source* of his facts.

### B. Cooperative "scheme"

82. Although WOODLOCK's *ex parte* acquisition of defendant roles does not (on its own) constitute vitiating fraud and harm to FELDMAN, this act clearly does not stand alone – it runs tandem with WOODLOCK's equally likely *ex parte* depositions of the defendants which deprived FELDMAN of her right to cross-examine them and demonstrate they did not *create* the works for which WOODLOCK gave them credit.

83. Where WOODLOCK allegedly does not know any of the defendants, such specifics about them can come only from them. Where WOODLOCK's only access to the defendants was thru counsel, for WOODLOCK to depose all 5 of these defendants *ex parte*, he necessarily had acquired FOLEY and DWT/BR's full cooperation in foreclosing FELDMAN from participating in proceedings that directly affected her substantial rights. *(US v. Bagley, at 681)*

### C. WOODLOCK "Complained" as to Similarity using Manufactured "Facts"

84. Where Chart #4 is extensively referenced, a copy is appended as Exhibit A.

85. Where McNAMARA et.al. provided the *Journeyman* items to all parties, it is fair to say both they and WOODLOCK had direct access to them and that each easily could confirm the falsity of their own claims about them.

86. Surely, the 6 *"Fox defendants"* who took responsibility for *Journeyman* knew their own content better than anyone (save maybe FELDMAN). And yet, their pleadings are replete with *misinformation* that has nothing to do with actual content [Dkt. 53][Dkt. 104][Dkt. 162] [Dkt. 0010618120] meaning that "much of their proffered evidence ... was manufactured or misrepresented" [see: Chart #4] *(Kingsland v. City of Miami, 382 F.3d 1220, 1232 (2004))*

*ABA Rule 3.4(b) – a lawyer shall not provide false evidence or aid a witness in doing so; "consistent and repeated misrepresentation"*

87. Rather than rely on the best and only "relevant evidence" – the actual items – WOODLOCK quoted (right in the judgment) multiple of his co-defendants' *fake highpoints* (nearly verbatim) which presumes his reliance on them as if they are *'facts'* – *vital* to the work and *vital* to similarity [Chart #4]. It also confirms that DWT fraud exceeds merely *'preparing'* false "evidence". When the instant defendants are limited to using only the actual DVDs (as submitted) all (including WOODLOCK) necessarily will fail to direct This Court to the fake fact below and all of the 40+ others culled into Chart #4.

> *DWT, et.al. – "All of Dan's time travels are located in the San Francisco area."* [Dkt. 53, at 6] [Dkt. 00106181620, at 7].
>
> *WOODLOCK – "All of his [Dan's] time traveling is in the San Francisco area."* *(Feldman, at 360)*

88. It is not as if WOODLOCK did not know pre-judgment that his co-defendants manufactured this and other claims just for court, or as if FELDMAN let their fabrications *slide*. On Sept. 1, 2009 FELDMAN apprised WOODLOCK of the ways in which this particular *facts* is fake

> *Pltf. Ex E – in at least 2 episodes that aired, character "Dan" time travels off the planet entirely (Ep 2 twice) and well outside the borders of California (Ep 2 and 5).*

20

89. This means that WOODLOCK was "not excuse[d] from ... conducting a reasonable investigation" [and in fact was obliged] to look further." *(Wiggins v. Smith, 539 US 510, 519 (S.Ct. 2003); Wiggins v. Corcoran, 164 F. Supp. 2d 538, 559 (2001).*

90. Instead, WOODLOCK entered additional *'fake facts'* that he invented himself – the most flagrant of which is an *"inoperable tumor"* for character "Eli" – finding it so *vital* to the work and *vital* to similarity that he was compelled to highlight it right in the judgment *(Feldman, at 362). ("a judgment obtained directly by fraud" (Throckmorton, at 66).*

91. "Nowhere in the record [or the actual items] is there [so much as a] reference to the alleged [*"tumor"*, meaning that WOODLOCK not only] argu[ed] a fact not in evidence [he] compound[ed the harm with his] personal assurance that he found" it himself. And yet, This Court will find that (in the entirety of *"Eli Stone"*) no character ever is afflicted with any sort of a *"tumor"* let alone one that is *"inoperable!" (Bryant v. State, 741 A.2d 495, 501 (1999); Commonwealth v. Kater, 447, NE 2d 1190, 533 (Mass: SJC 1983)).*

92. WOODLOCK inventing his own *facts* "amount[s] to willful misconduct [that was] intentional and not reasonably justified[ and] a willful dereliction of responsibility both to []his own] court and [the panel after him]." *(Damiani v. RI Hospital, 704 F.2d 12, 14-15 (1st Cir. 1983)).*

93. Where the panel totally deferred to WOODLOCK, it is presumed that they also relied on *"evidence"* that WOODLOCK and his co-defendants manufactured just for court:

*THE PANEL – "Substantially for the reasons stated in the detailed Memorandum and Order ... the judgment [] is affirmed." [Dkt. 00106197199, at 1]*

The likelihood is, that the panel concluded WOODLOCK had independent knowledge when (in reality) his *facts* do not even exist. *(State v. Singh, 259 Conn. 693, 793 A.2d 226 (Conn: S.Ct. 2002), citing U.S v. Salameh, 526 U.S. 1028, 119 S.Ct. 1273, 143 L.Ed.2d 368 (1999)).*

94. There is a critical distinction between WOODLOCK's protected *"thought process"* and him

manufacturing *'facts'* to reduce FELDMAN to exhausted compliance. While WOODLOCK

may keep his *"thought process"* a secret, FELDMAN may call him to identify the *source* of

his facts and answer what always has been the material question:

> *What is the source of WOODLOCK's fake "tumor" and other facts as to the 200+ ABC items and why has that source been such a closely guarded secret for nearly 4 years?*
>
> > *"deliberate deception of a court ... is incompatible with "rudimentary demands of justice"" (Mooney v. Holohan, 294 US 103, 112 (S.Ct. 1935); Pyle v. Kansas, 317 US 213 (S.Ct. 1942)).*

## V.    Fraud by non-disclosure

95. WOODLOCK's stated that three of FELDMAN's books were part of her case and that his

admitted failure to acquire two of her books left a *"gap in the record"*:

> *"Plaintiff's claims are ... based upon alleged infringement of An Ordinary Hero, The Comfort of Strangers, and The Red Tattoo." (Feldman, at 364-365)*
>
> *"The parties have not submitted Plaintiff's third and fourth books, The Red Tattoo and Days of Grace. This gap in the record ..." (Feldman v. Fox, n.2)*

96. Surely, WOODLOCK was obliged to define the exact size of *"the gap"* and provide an

equally comprehensive list of every defendant item that he also failed to acquire and one for

those items he never saw at all (despite being filed) – a *complete* and *accurate* list.

> *"There is much case law in Massachusetts supporting the proposition that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party." (Bennett v. Travecca, No. M2004-01287-COA-R3-CV, Pt. II, ¶7 (Tenn: Ct. of App. 2005) (emphasis added)*
>
> *"[E]ven a voluntary disclosure of information that a reasonable [person] would consider material must be complete and accurate [and] must reveal [] those facts "that are needed so that what was reveled would not be so incomplete as to mislead"" (Hill v. Gozani, 638 F. 3d 40, 57 (1st Cir. 2011) (emphasis added)*
>
> *"... "a duty to disclose may exist where ... one party has knowledge of material facts to which the other party does not have access." (emphasis added)*
>
> *"... if [a party] does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts*

*bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies. "*

*collecting 1st Circuit cases: VSH Realty v. Texaco, 757 F. 2d 411, 414 (1st Cir. 1985); New Jersey Carpenters v. Biogen IDEC, 537 F. 3d 35 (1st Cir. 2008); In re Cabletron Sys., 311 F. 3d 11, 36 (1st Cir. 2002); Backman v. Polaroid Corp., 910 F. 2d 10, 16 (1st Cir. 1990) (en banc); Witherspoon v. Philip Morris, 964 F. Supp. 455, 460 (1997); In re Interbank, 668 F.Supp.2d 44 (2009); Maxwell v. Ratcliffe, 356 Mass. 560, 562-63, 254 NE 2d 250 (1969); Kannavos v. Annino, 356 Mass. 42, 48, 247 NE 2d 708 (1969).*

97. Instead, WOODLOCK fraudulently concealed material facts from the panel: (1) that he had

*exactly NONE* of the 200+ ABC items; (2) that a number of the FOX items are blank or

simply do not play [*e.g.,* Dkt. 51-4, #13]; and (3) he had no idea what items he did (or did

not) have. Considering the *list* of fake facts that WOODLOCK corroborated for DWT, et.al.,

it is entirely likely he never saw any of the FOX items either [Chart #4].

*"when a [judge] has failed to disclose material fact ... the trier of fact [may] presume reliance ... where the plaintiff[] could justifiably expect that the [judge] would disclose material information (Shores v. Sklar, 647 F. 2d 462, 468 (5th Cir. 1981) seeing: Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ...*

*"Failing to disclose information is equivalent to a false representation [] when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent." (Allen v. Devon Energy Holdings, LLC, Tex: Court of Appeals, 1st Dist. 2011; seeing: In re Int'l Profit Assocs. Inc., 274 S.W.3d 672, 678 (Tex. 2009)).*

98. To begin, FELDMAN filed *Days of Grace* as Pltf. Ex S (Sept. 1, 2009). Second, all attempts

to play the DVD of *Journeyman, Ep 13* necessarily result in failure. And, the only thing

FOLEY, *et.al.* said of the 200+ ABC items is that WOODLOCK never had any of them.

99. Where WOODLOCK never so much as claimed watching these 200+ ABC episodes (even at

home on his own TV) surely any reasonable jury would find it egregious misconduct he had

anything *at all* to say about them.

| ***FOLEY,et.al.*** [Dkt. 00116194296, at 2] | ***WOODLOCK*** *(Feldman v. Fox, 361, 362)* |
|---|---|
| *"Grey's Anatomy, Private Practice, Eli Stone ... Copies of <u>these DVDs were not before the district court</u>"* | *"Grey's Anatomy* centers on the lives of medical interns, residents, and doctors at the fictional Seattle Grace Hospital in Seattle, Washington. *Private Practice*, a spin-off series of *Grey's Anatomy,* follows doctors in private practice together in Los Angeles.  Both series feature melodramatic medical issues and on-again, off-again romantic relationships among co-workers." |
| | *"Eli Stone* is a comedy-drama that aired on ABC.  ... The show centered on a lawyer, Eli Stone, who has an inoperable brain tumor that caused hallucinations, which he took to be prophecies." |

100. It appears that (for WOODLOCK) *"review to the extent necessary"* actually is a euphemism for *"never saw any of it" (Feldman, at 363)* meaning that his 2-page dissertation on the probative similarity between FELDMAN's books (which he did not have or did not read) and the 200+ items he failed to acquire violated FELDMAN's right to due.

101. WOODLOCK's prejudice in favor of the defendants also must be presumed as his *'clairvoyance'* is limited to the defendant items (and does not extend to FELDMAN's books).

   *(Star Scientific v. RJ Reynolds, 537 F. 3d 1357 (2008); Rios v. Bigler, 847 F. Supp. 1538, 1546 (1994); Citizens Nat. Bank v. Allen Rae Inv., 142 SW 3d 459, 479 (2004)).*

102. Again, there is a critical distinction between WOODLOCK's protected *"thought process"* and his secret maneuverings that deprived FELDMAN and the panel of the evidence upon which he relied, which in turn and *"<u>for the sake of completeness</u>"* (of all things) reduced FELDMAN to exhausted compliance with facts he manufactured himself *(Feldman, at 366)*

103. While WOODLOCK can keep his *"thought process"* a secret, FELDMAN may call him to identify the <u>*source*</u> of his *'facts'* for the 200+ missing ABC items, as the material question

always has been:

> *What is the source of WOODLOCK's judgment facts and why has that source been such a closely guarded secret for nearly 4 years? (see: chart, previous page)*

## VI. Counsel manufactured 'dissection and comparison' of items that prevented any actual comparison from *ever* taking place

104. If DWT, et.al. had not also manufactured a fake *'dissection and comparison hearing'* at

appeal (to prevent remand for an actual comparison) surely the judgment in *Feldman v. Fox*

would have been remanded upon FELDMAN's appeal from it.

105. "Appx. 2" is the minutes of the Int'l Sch. Conf., however DWT, et.al. pointed directly to

"Appx. 2" falsely identifying it as evidence that WOODLOCK "properly dissected and

compared" over 200 items that never were given to him:

### McNamara Diagram:

> *"After a review of the respective works* [Dkt. 00116181620, at 5] ... *[on] September 1, 2009, a hearing was held (Appx. 2).* [Id. at 15] ... *The Court properly dissected the works, separating out protected expression from those aspects not subject to copyright protection* [Id. at 17] *...the district court made an independent finding [about] probative similarity between the works at issue.* [Id. at 16] ... *Following a fair and complete ... comparison of [the] various works"* [Id. at 20] *...The District Court ... compared the actual works.* " [Id. at 21]

106. And yet, the record itself confirms this 35-minute meeting dealt with other matters

[Dkt. 60][Dkt. 60-2] and that during the Conf. no work or character ever was mentioned by

name (see: Conf. minutes and Electronic Clerk's Notes [Dkt. 150-1, at 16, Pt. 2]).

107. And, although WOODLOCK's *"Standard of Review"* merely acknowledges what he

should do, DWT, et.al pointed directly to that *"Standard"* and re-labeled it as evidence and

an "explicit statement" of what occurred in WOODLOCK's court:

> *"the Court explicitly stated in its decision that "in considering Defendants' motions to dismiss, [it] review[ed] the parties' works referred to in the complaint" to the extent necessary." (all changes original to the defendants) [Dkt. 162, n.1]*

25

108. Surely, the *"math"* alone confirms DWT, et.al. entered *a series* of blatant fabrications, as it is impossible that WOODLOCK dissected and compared 4 books (nearly 800 pages) and over 220 DVDs that each run 45 minutes during a meeting that lasted exactly 35-minutes.

109. Any jury would find it material that DWT, et.al. went on to manufacture additional lies to cover their previous lies – blanket claims of what WOODLOCK did with the 200+ items he failed to acquire:

*"Plaintiff ... claims [] that the court failed to consider the works at issue. Pl.'s Br. at 9-10. This claim is incorrect" [Dkt. 162, n.1]*

*"the district court thoroughly examined ... the allegedly infringing television shows"* [Dkt. 001063533355, at 1-2].

110. Against the DWT, et.al. *court-insistence* (above) there was a *'dissection and comparison hearing,'* their *public-advertisement* is that the proceeding was limited to "an upfront motion."

### DWT's Advertisement:

*"Feldman v. Twentieth Century Fox, et al ... On an upfront motion, plaintiff's copyright claims were dismissed" (www.dwt.com/people/ElizabethAMcNamara/)*

Clearly the facts cannot be both ways, so, either DWT, et.al. lied to prevent remand (exactly as FELDMAN urges) or they are engaged in fraudulent advertising.

111. The facts and record support the former, as there no evidence that WOODLOCK ever saw any of the items, nor can the defendants legitimately produce such evidence for This Court even now – no *invitation*, no court calendar, no Electronic Clerk Notes, no minutes.

112. Also, where three of FELDMAN's books were unpublished at the time of infringement and WOODLOCK sealed all discussion of them, any legitimate 'dissection and comparison' of these unpublished books necessarily would have been *in camera* or in a closed court.

113. Again, we turn to the record and to simple common sense. The record confirms there were no *in camera* or closed court proceedings [Dkt. 150-1]. WOODLOCK did not even have the

vast majority of the items at issue, therefore he could not possibly have compared them.

114. This Court must conclude that FELDMAN was harmed; as each subsequent court was induced to believe that he did, which maintained deprivation of FELDMAN of due process rights – direct comparison of the actual items as laid out by *Johnson (see: Johnson v. Gordon, 409 F. 3d 12, 18-19 (1st Cir. 2005)).*

## VII. Character Assassination – Counsel/Defendants

115. McCARTER and DWT (each et.al.) twisted FELDMAN's words to attribute to her ridiculous claims she never made herself:

> *"Although Ms. Feldman alleges that these shows mirror her life, she is not ... a time traveler." (emphasis added)* [Dkt. 97, at 1-2]

> *"Most bizarrely, plaintiff also claims that ... she had been on a plane that crashed, but somehow, she was inexplicably transported off the plane ... "* [Dkt. 104, at 3-4]

116. Upon reading FELDMAN's actual account of the plane crash (referenced immediately above) [Dkt. 79/81, at 41-43] Counsel clearly distorted FELDMAN's words to damage her credibility by painting her as ridiculous.

117. At appeal, McCARTER and ZELLE (each, et.al.) misrepresented themselves as licensed medical professionals (which none of them are) to further assassinate FELDMAN's character with a *series* of un-couched medical lies that *poisoned* the panel against her and stigmatized her with a pathological psychosis. Put more simply, *'a screw loose'*.

| |
|---|
| *McCARTER, et.al.: "demonstrating ... paranoid nature" ...........* [Dkt. 00106181650, at 13] |
| *ZELLE, et.al.: "Debra Feldman ... borderline delusional" .....* [Dkt. 00116181617, at 1] |
| *"is ... paranoid" ............................................................* [Id., at 2] |
| *"border on paranoid and delusional" ......................................* [Id., at 13] |

118. The fact that these medical lies literally book-end DWT, et.al. filing their self-invented *'dissection and comparison hearing'* (Mar. 10, 2011, at 5:47, 4:27, 4:15 PM, respectively)

speaks to the careful planning behind the *scheme* to deprive FELDMAN of even a chance at a fair appeal.

119. Where the panel denied FELDMAN's appeal even before she could move to strike these lies and then (on Petition) actually denied her Motion to Strike [Dkt. 00116206868] the panel prejudicially preserved this libel both in and for the record:

> *"All pending motions are denied." [Dkt. 00116215442, at 1] filed, Apr. 15, 2011*

120. *"[W]hile [counsel] may strike hard blows, [they are] not at liberty to strike foul ones," (Berger v. United States, 295 US 78, 88 (S.Ct. 1935)* and yet McCARTER,et.al. clearly took the above denial as *carte blanch* to continue defaming FELDMAN. Nearly one year later (Mar. 26, 2012) in their continued stride to turn a copyright claim into a sanity hearing, McCARTER, et.al. quoted their own libel *(ABA Rule 3.5(c ) and Rule 3.4 (e), also Comment [1]; Chambers v. Nasco, 501 US 32, 35 (S.Ct. 1991)):*

---

### *"STATEMENT OF THE CASE*

*This case is about a paranoid and perhaps deluded woman who simply cannot accept the [] basic truth"*. [Dkt. 00116353072, at 2]

---

## *VIII. Character Assassination – WOODLOCK*

*"The admonition against public comment about the merits of a pending or impending matter continues <u>until the appellate process is complete</u>. If the public comment involves <u>a case from the judge's own court</u>, the judge should take <u>particular care</u> so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality." – Canon 3(A(6), Guide to Judiciary Policy, Vol. 2A, Ch. 2*

### *A. Background on FELDMAN*

121. FELDMAN fulfilled her primary education on the academic track, graduating with honors (top 5% of her class). She then *waived* the entire college requirement for both English and Math and earned 27 credits via placement testing – 9 credits each: Philosophy, English, and

Math– all before her first day of college.  FELDMAN went on to graduate early then

returned to earn her Master's in one year's time.  More recently, within a 27-day span (and

one sitting each) FELDMAN passed all three IRS exams to become an Enrolled Agent.

## B.  Prejudice Against the Class pro se

122.  Despite multiple opportunities to ask *pro se* FELDMAN what she "understands" (within

her own case) WOODLOCK never deposed her and (instead) waited nearly 3 years and an

entirely separate case publicly to *'assassinate'* her intellect and ability to "understand" basic

English:

> *"like the [] plaintiff in Feldman ... McGee fails to understand the fundamental difference*
> *between idea and expression." (McGee v. Benjamin (08-11818-DPW, Pt. 2, ¶5, (2012))*

123.  Where WOODLOCK's inflammatory *'editorial'* directly compares *pro se* McGee to

FELDMAN herself there is no construct under which it is not about FELDMAN and the

merits of her case *(Affiliated Ute, 153-154).*

> *Canon 2(B):  A judge's testimony injects the prestige of the judicial office into the*
> *proceeding and may be perceived as an official testimonial.*

124.  Where FELDMAN had no part in *McGee,* WOODLOCK necessarily went to considerable

lengths to drag her into that case and *'lecture about her'* to third parties with no interest at all

in the *Feldman* action. *(Canon 2(B), supra).*  Where libeling *pro se* is not an adjudicative duty

and WOODLOCK's extrajudicial comment on FELDMAN did not serve the interest of

justice, it is not protected by absolute privilege simply because it appears in a judgment.

125.  Surely, WOODLOCK was advised of FELDMAN's appeal [Dkt. 169] and well-knew that it

was pending on the day he *'published' McGee* (March 20, 2012).  As an experienced judge he

also was knew the ban on his public comment while appeal was pending.

126. Where *McGee* and *Feldman* both are rulings from WOODLOCK's court and he also (and often) sits on the very panel considering FELDMAN's appeal (often by invitation from the Chief Justice) it cannot be argued that his *'word'* does not carry considerable sway in the Circuit or that the panel did not read *McGee*.

127. Considering that WOODLOCK publicly denigrated the merits of FELDMAN's case within another judgment, it appears that he used his position with the panel in an "attempt[] to arouse hostility" toward FELDMAN (as *pro se*) and improperly appealed to the panel's sense of duty to him as a brother-judge *(Singh (supra) at 719)*.

> *"particularly when issued by an officer of the court "objectionable matter in the form of editorial comments ... have been held fatal to verdicts" (Clyde Mattox v. United States, 147 US 140, 150 (S.Ct. 1892); see also: Bradley v. Hartford Accident, 30 Cal.App.3d 818 (1973)).*

128. The fact that WOODLOCK used *McGee* to attack two additional *pro se* whom he never met at all does not undo (or diminish) the harm to FELDMAN *(New York Time, at 256-257)*. Where FELDMAN and "additional *pro se*" Martin Alexander each were appealing claims against the identical group of defendants – NEWS, Fox Group and ABC-Disney (among others) – it also *appears* that WOODLOCK used *McGee* as a back-door lobby of the 1st Circuit not to hear FELDMAN, and of the 2nd Circuit not to hear *pro se* Alexander *(see: Alexander v. Murdoch, et.al. 11-4291 (2012))*.

> *"A court "will reverse [] based upon comments of the trial judge [when] the comments are so prejudicial as to amount to denial of a fair [appeal]" (US v. Ramos, 933 F. 2d 968, 973 (11th Cir. (1991); US v. House, 684 F. 3d 1173, 1208 (2012).*

### C. Character Assassination – In Sum

129. Although false claims of a personality disorder and general stupidity may not be *explicitly* degrading, when taken *as a whole* and in the context of the entire case, the implicit overtones must be characterized as repetitive and "gratuitous character assassination" that adversely

affected the overall outcome of *Feldman v. Fox. (State v. John M., 87 Conn. App. 301, Pt. II*

*(Conn: App. Ct. 2005); State v. Williams, 204 Conn. 523, 547 (Conn: S.Ct. 1987)*

130. Where the instant defendants' disparaging comments on FELDMAN verifiably are untrue

and published without any regard for actual facts, they are libel with a presumption of malice.

*"because the statements were libelous per se, "the law . .. implies legal injury from the bare fact of publication itself ... falsity and malice are presumed,"" (New York Times v. Sullivan, 376 US 254 (S.Ct. 1964)*

## IX.  Deprivation of Applicable Copyright law

### A. Feist Publications, 499 US 340 (S.Ct. 1991)

131. The law does not take issue with FELDMAN "gather[ing] parts of the plan and arrangement

[of her elements] from existing and known sources," as even telephone books (which consist

of nothing but facts) are copyrightable under the law:

*"... even a directory that contains absolutely no protectable written expression, only facts, meets the constitutional minimum for copyright protection [when] it features an original selection or arrangement" of those facts.  (Feist, at 349)*

132. The "question is not whether [FELDMAN's elements] are entirely new, and [] never [] used

before … The true question is whether [her] same plan, arrangement and combination of

[those elements] have been used before." [see: Dkt. 74-6] *(Edwards & Deutsch v. Boorman,*

*15 F. 2d 36, 36 (7th Cir. 1926)).* WOODLOCK never addressed that question.

### B. Universal v. Film Ventures, 543 F. Supp. 1134 (1982)

133. The law supports FELDMAN's claim that the defendants infringed her work by blending

several of her characters into fewer infringing characters. And (in 1982) NBC-Universal

urged that exact claim to protect themselves from infringer Film Ventures:

*'an infringing character can be "a combination of two characters" from the infringed work' (Universal v. Film Ventures, at 1137-1138, Pt. 14.d (1982).*

134. Contrarily, DWT, McNAMARA and PA *deliberately* entered a fake requirement of law:

31

*DWT, et.al. – "the law requires ... that two individual characters are substantially similar, not that one character shares "traits" with a composite grouping of several other characters."* [Dkt. 104, at 10] (emphasis added).

135. FELDMAN says "deliberately entered" because DWT, McNAMARA and PA specialize in

copyright and directly represented NBC-Universal who (in 1982) urged the *Film Ventures*

defense and directly benefited from the *Film Ventures* decision, which has stood a 32-year test

of time, where subsequent courts used *Film Ventures* to find *against* both NBC and ABC:

*"defendant's amalgamation of plaintiff's characters into one character can be infringing if the one character fulfills the same plot roles as the plaintiff's original characters did." (Sony Pictures v. Fireworks Enter. Group, 137 F. Supp. 2d 1177, 1186 (2001))*

*"finding substantial similarity between one character in defendants' work and a combination of two characters in plaintiffs' work" (Robinson v. New Line Cinema, 42 F. Supp. 2d 578, 595 (1999); Olson v. NBC., 855 F. 2d 1446, 1452 and n.5 (9th Cir. 1988); In re Capital Cities/ABC, Inc., 918 F. 2d 140, n.9 (11th Cir. 1990))*

136. Where WOODLOCK preserved DWT, et.al. fake requirement in the record and for posterity,

his reliance on is presumed as is him withholding applicable and material law from

FELDMAN – *e.g. Universal v. Film Ventures, Pt. 14.d:*

*"Misleading statements will [] defraud [courts] even if the [courts] do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and [deprivation of] the plaintiffs' [right to claims and defenses] in such a case is no less significant than in a case of direct reliance on misrepresentations." (Basic v. Levinson, 485 US 224, 244 (1988); Peil v. Speiser, 806 F. 2d 1154, 1160-1161 (CA3 1986)).*

### C. M-G-M v. American Honda, 900 F. Supp. 1287, 1294-1295 (1995)

137. Courts agree that writers can blend commonplace sub-genres and restrictions, etc. to create

"a novel arrangement" or a unique sub-genre that never existed before. *(Sheldon v. MGM, 81*

*F. 2d 49, 55 (2nd Cir. 1936); Universal v. Harold Lloyd 162 F. 2d 354, 363 (1947)):*

*"a fresh and novel approach [that] "hybridize[d] the genres ... This amalgam ... was also a departure from [] literary source[s] ... this distinct mélange [], which was also seminal ... created a [unique sub]type ... that was not there in [books,*

*TV or] films of that ilk hitherto." (M-G-M v. American Honda, 900 F. Supp. 1287, 1294-1295 (1995); also: Leibovitz v. Paramount, 948 F. Supp. 1214, 1221 (1996); SunTrust v. Houghton Mifflin, 136 F. Supp. 2d 1357, 1367 (2001)).*

138. FELDMAN stated that exact claim – that mixed with her other elements hers is the only time travel that is *both* serial and involuntary (not just involuntary). WOODLOCK; however, withheld the law and eliminated half of her claim – essentially stated that nothing ever would make time travel *original* or even the least *unique (see: Pt. IX.A. (supra))*:

> *"time travel is a general idea that is not subject to copyright protection "involuntary time travel is a common trope" (Feldman, at 367).*

### D. Wilkie v. Santly 13 F. Supp. 136, 136 (1935) – alternate demonstration of "access"

139. By way of example, four of FELDMAN original elements in *The Red Tattoo* and *The Comfort of Strangers* are (1) that her character is not simply seen as *'a profit'* but specifically is comparable directly (and only) to Moses; (2) when one *traveler* dies another *'tangent'* traveler is conscripted by an entity to *replace* them and pick up where the dead traveler left off; (3) her core group of three – a lawyer with visions (taken to be prophesies), his brother the doctor (who had exactly one vision), and a singer/dancer whom the lawyer sees in a vision before he meets her in the present (and is in *'need'* of a heart transplant); and (4) the order of the dancer's 3-step dance combination (selected from thousands of dance moves).

> *"When common sources [do not] exist for the alleged similarities ... there is [] infringement. (Flud v. NBC, 390 F. Supp. 877 (1975); Olson v. Tenney, 466 F. Supp. 2d 1230, 1236 (2006); Alexander v. Haley, 460 F. Supp. 40, 45 (1978); Costello v. Loew's, 159 F. Supp. 782 (1958); Greenbie v. Nobel, 151 F. Supp. 45, 65 (1957)).*

> *"[When] the complaining work contains an unexpected departure from the normal metric structure ... and the accused work repeats the unexpected element ... it is more likely that the there is some connection between the pieces (Stewart v. Wachowski, 574 F. Supp. 2d 1074, 1103 (2005)*

140. Had WOODLOCK bothered to acquire *The Red Tattoo, Eli Stone* and replacement for the damaged *Journeyman* DVD/s he easily would recognize each of FELDMAN's elements

33

echoed in these later works – Moses-traveler comparison *(Eli Stone);* traveler selection

*(Journeyman; Eli Stone);* core group of three *(Eli Stone);* 3-step dance combination *(Eli*

*Stone).*

> *"so idiosyncratic as to preclude coincidence [this] might suffice to show copying"*
> *(dictum), Heim v. Universal, 154 F. 2d 480, 488 (2nd Cir. 1946).*
>
> *"so nearly alike as to warrant an inference of copying ... [and exclude] the result of mere*
> *accident or coincidence," Wilkie v. Santly, 13 F. Supp. 136, 136 (1935)*
>
> *when original elements in "two works are so nearly alike the only reasonable explanation*
> *for such a great degree of similarity is that the later ... was copied from the first."*
> *(Tisi v. Patrick, 97 F. Supp. 2d 539, 548 (2000) (emphasis added))..*

141. By way of another example, the travel experience suffered by FELDMAN's character is

echoed in *Grey's Anantomy* – although it is winter the traveler removes her coat and suffers a

medical trauma when she falls awkwardly; she fell from a height into deep water, and

apparently drowned, but reappears in an alternate universe dry as a bone. She finds herself at

a facility that provides medical education and in the company of two men she knows from her

own reality, one permanently injured on-the-job. She awakens lying on a gurney (in the

hospital of her youth) still suffering from after-effects of her fall. She sits up on the gurney

and is greeted by *'Doc'* who sits next to her on the gurney; she is so delighted to see *'Doc'*

that she spontaneously lavishes affection on him.

142. Had WOODLOCK bothered to compare *The Comfort of Strangers/The Red Tattoo* to

*Grey's Anatomy* or even let FELDMAN present her comparables [Dkt. 137-3] he easily

would recognize every facet of her expression echoed in *Grey's,* episode *"Walk on Water."*

143. Although there is "no evidence that [the totality of FELDMAN's elements] ever previously

appeared in like combination, arrangement or form," *(Universal v. Harold Lloyd, 162 F. 2d*

*354, 363 (1947); Cohen v. Western Auto, 33 F. Supp. 25, 26 (1940))* and there is *"no*

*prototype in either story or novel"* for any of the above expression and Copyright law attests

to the virtual certainty of access and copying when every facet of expression (such as that in

FELDMAN's three unpublished books) also appears in the defendants' items, WOODLOCK

prevented FELDMAN from demonstrating access and copying with the actual items.

> *"Proof of striking similarity is an <u>alternative means of proving "copying"</u> [even] where proof of access is absent" (Stewart v. Wachowski, 574 F. Supp 2d 1074, 1100 (2005) citing Baxter v. MCA, 484 US 954 (S.Ct. 1987) and Herzog v. Castle Rock, 193 F. 3d 1241, 1249 (11th Cir. 1999); Baxter v. MCA, 812 F.2d 421, 423, 424 n.2 (9th Cir. 1987)*

> *"[I]n the <u>absence of any proof of access</u>, a copyright plaintiff <u>can still make out a case</u> of infringement by showing that the [items] are "strikingly similar"." (Three Boys Music v. Bolton, 212 F.3d 477, 484 (9th Cir. 2000)*

<u>Collecting cases</u>: *Smith v. Jackson, 84 F.3d 1213, 1220 (9th Cir. 1996); Selle v. Gibb, 741 F. 2d 896, 901 (7th Cir. 1984); see also: Nimmer §13.02[B] at 13-14, 13-15 (1986); Unicolors v. Wet Seal, SACV 12-1065-DOC (JCx) (2013) (all emphasis added)*

> *"[when] independent creation, coincidence and prior common source are, as a practical matter, precluded. ... then copying is presumably proved simultaneously." Selle v. Gibb, 741 F. 2d 896, 901, 904 (7th Cir. 1984)).*

144. Instead, WOODLOCK acted as defense counsel <u>in his own court</u> – literally defended the

defendants from his bench. Then, he did exactly as he *'threatened to do'* – he looked no

further than what *"<u>the defendants certainly said</u>"*:

> WOODLOCK: *"I mean, let me just see if I can put it in perspective.  <u>The defendants have certainly said</u> that there really <u>isn't any showing of copying</u> here."*

145. Had a reasonable jury compared even just these few sections of FELDMAN's books to the

infringing items (and applied the law to their comparisons) there is every likelihood that the

outcome of FELDMAN would have been differen*t (Neder v. US, 527 US 1, 19 (S.Ct. 1999)).*

### F.  *WOODLOCK rewrote FELDMAN's Cplt.*

146. McCARTER, et.al. discerned FELDMAN's claim of plausible access was via her

appearance on WBZRadio [Cplt. ¶¶ 51, 52] and responded to it in 12(b)(6) motions. And yet,

they also combatively urged that FELDMAN *"failed"* to state a claim *(Alston, at 234)*

*"Specifically, Ms. Feldman alleges that ... any defendants ... could have heard about her on a local Boston night-owl radio program"* [Dkt. 97, at 6]

147. WOODLOCK agreed FELDMAN's claim was viable if dissemination were wide enough:

*"the radio show ... present a somewhat closer question. Widespread dissemination may be sufficient to demonstrate a reasonable likelihood of access." (Feldman, at 365)*

148. Where no dissemination is wider than *worldwide*, surely FELDMAN stated a claim without

listing each of the 50 United States and every country around the world:

*"Cplt. ¶ 51 ... Plaintiff was interviewed on ... "WBZ" [] with broadcast capabilities extending worldwide."*

*"Cplt. ¶ 52 Worldwide ... any person/s may [could] hear that radio broadcast in real time"*

149. Rather than accept FELDMAN's claim as true – as is required without *"detailed factual*

*allegations" (Ashcroft v. Iqbal, 129 S.Ct. 1937, at 1949 (S.Ct. 2009) citing Twombly at 127;*

*see also: Rule 8(a))* WOODLOCK deliberately rewrote Cplt. ¶¶ 51-52 insufficiently relying

on false information he either invented himself (or improperly copied from McCARTER,

et.al.) to imply that WBZ broadcasts reach Boston only:

McCARTER: *"local Boston night-owl radio program"* [Dkt. 97, at 6]

WOODLOCK: *"evidence of "... local air time" without other proof of access is generally not enough to demonstrate a reasonable possibility of access." (Feldman, at 365) (see also: "local late-night radio show" (Feldman, at 365)*

150. Clearly, every business must be somewhere and WBZ admittedly is *housed* in a local

building. However; WBZ's physical address does not diminish their broadcast area which is

*worldwide* (exactly as FELDMAN repeatedly stated):

[Dkt. 79/81, at 5]: *"local radio, ... with worldwide broadcast capabilities (... and, therefore, a worldwide audience."*

[Pltf. Ex H, at 41]: *"... radio interview ... broadcast world-wide on WBZ"*

[Pltf. Ex J, at 4]: *"WBZ has a world-wide listening audience."*

151. This Court must note that WOODLOCK's judgment statement (below) *misled* the panel to

36

believe that FELDMAN failed (or refused) to corroborate her claim when (in fact) he never

asked her to do so; and never even implied needed it *(Rule 12(e))*.

WOODLOCK: *"Plaintiff ... has offered no evidence of widespread dissemination of ... the local radio show." (Feldman, at 366)*.

### G. Failure to "Disclose", within a Corporate Disclosure

152. Dkt. 11 is TOUCHSTONE's corporate disclosure which misleads anyone reading it to

believe that TOUCHSTONE is solely an ABC-Disney venture, when (in fact) it is a material

partnership between ABC-Disney, LionsGate (Steven Spielberg) and DreamWorks.

153. The TOUCHSTONE partnership is material for several reasons. First, FELDMAN's work

was submitted to each of these non-defendant partners (unsolicited) multiple times – meaning

that TOUCHSTONE (and ABC-Disney) had access to FELDMAN's work multiple times.

Second, these non-defendant partners are self-admitted plagiarist – admitting in court to

plagiarizing the work *"Echo of Lions"* after it was submitted to them (also unsolicited) *(see:*

*court testimony, Chase-Riboud v. Dreamworks, No. CV 97-7619 ABC (Jgx); also: Chase-*

*Riboud v. Dreamworks et.al., 987 F. Supp. 1222, n.2, Pts. 3, 3(i) (1997))*.

154. Had FELDMAN know these facts on the day TOUCHSTONE filed Dkt. 11, surely she

would have pursued their connection to non-defendant parties who directly reviewed her

books – LionsGate and DreamWorks. Instead, Dkt. 11 induced FELDMAN not to

investigate these non-defendants' connection to her case:

*"[T]he reviewing court may consider directly any adverse effect that the [defense's concealment] might have had on the preparation or presentation of the [plaintiff]'s case." (U.S. v. Bagley, 683)(emphasis added)*.

### H. Access – In Sum

155. But for TOUCHSTONE's incomplete disclosure *(so incomplete as to be misleading, see:*

*VSH Realty and others)* and WOODLOCK's conscientious failure to apply well-established

law, FELDMAN easily would have stated a claim of access. Instead, FELDMAN was deprived of due process and equal application of actual law (6th and 14th Amendments) making the only material proceeding fundamentally unfair.

## X.    17 USC § 107 – the right of first publication

156. FELDMAN made clear (on day-one) that *The Comfort of Strangers* and *The Red Tattoo* each were *unpublished* [Cplt. ¶¶25-26] and DWT, et.al. agreed this claim was accurate:

> *"Plaintiff ... unpublished works (Comfort of Strangers and The Red Tattoo)"*
> [Dkt. 104, at 4]

### A.  The Comfort of Strangers"

157. DWT and FOLEY (both, et.al.) filed this manuscript as a public document [Dkt. 51-2, Fox Ex B] which destroyed the value of FELDMAN's copyright in it.

158. FELDMAN says "destroyed" for several reasons. First, counsel usurped her right of first publication (and/or distribution) *(17 USC § 107)*. The ECF system was made into a 3rd party infringer, *'selling'* copies of an *unpublished* book. And, despite WOODLOCK receiving not fewer than 10 advisories that *The Comfort of Strangers* was unpublished [Cplt. ¶¶25-26] [Dkt. 104, at 4][Dkt. 73, ¶¶ 1A, 1B, 4A, 4B, 4C, 4D, 6] and despite personally granting it court seal [Dkt. 151, at 16, Pt. 2] WOODLOCK deliberately misinformed the panel that (at the time of infringement) this work was ripe for "fair use":

> *"Of the four books in [FELDMAN's] series, two, The Comfort of Strangers and An Ordinary Hero, were published    (Feldman, at 360) (emphasis added)*

159. Certainly, This Court must find it material that DWT and FOLEY induced the Copyright Office to believe they needed the manuscript of *The Comfort of Strangers* for discussion in litigation. And yet, they stated only immaterial facts from it – the names Kendall and Gordon and Kendall's profession [Dkt. 53, n.4] (which is not a discussion). Then, they

invented an *"emphasis"* within it that verifiably does not exist:

> *"There is also an emphasis on fertility treatment, which Kendall['s] mother undergo[es]"* [Dkt. 53, n.4]

160. Despite FLEDMAN's clear objection [Pltf. Ex E, at 34] WOODLOCK aided DWT and FOLEY by preserving this *fabrication* both in and for the record, which presumes his reliance on it.   However, where Kendall's mother (Audrey) never receives fertility treatment, FELDMAN clearly did not place any *"emphasis"* on it.

161. Where the *only real thing* DWT and FOLEY did with *The Comfort of Strangers* was make the entirety of it publicly available – before FELDMAN published it herself – it appears that was their actual reason for acquiring it – despite 37 CFR § 201.2(d)(2)(ii)(C).

162. Surely even ABC and NEWS (each et.al.) knew this was *'infringement'* as they knew enough to sue Sony for inventing a machine that had only the *'potential'* to aid infringement *(Universal v. Sony 429 F. Supp. 407 (1977); 480 F. Supp. 429 (1979); and 659 F. 2d 963(1981))*; the court found against ABC for using as little as 7 seconds of Iowa State's copyrighted material *(Iowa State Univ. v. ABC, 621 F. 2d, 57, 59-60 (2nd Cir. 1980))* and NEWS won their suit against Gawker Media for their pre-release of 11 pages of unpublished book *"America By Heart" (HarperCollins v. Gawker, 721 F. Supp. 2d 303, 305-7 (2010))*.

163. Still, WOODLOCK fully cooperated in *'publishing'* all 211 pages of *The Comfort of Strangers* (right out from under FELDMAN) as he approved its public docketing.

164. Where filing *The Comfort of Strangers* under seal would not have affected WOODLOCK's use of it, the public docketing of it clearly "was intentional and not reasonably justified." It also constitutes "a willful dereliction of [] responsibility both to th[e Circuit] court and to the [Copyright Office]." *(Damiani v. RI Hospital, 704 F.2d 12, 14-15, (1st Cir. 1983))*.

## A. "The Red Tattoo"

165. It is material that DWT and FOLEY (both et.al.) induced the Copyright Office to believe they required *The Red Tattoo* manuscript for discussion in litigation – and yet, never cited to it; never filed it after receiving it; and (in fact) spent over 4 years concealing the fact that they even had it. And, as part of the *scheme* to convince the courts that *The Red Tattoo* was not copyrighted at all, counsel made *'fake admissions'* for FELDMAN:

   *e.g., "plaintiff admits she did not register The Red Tattoo ... with the Copyright Office"*
   [Dkt. 104, at 1]   see also: [Dkt. 53, at 7, 26, 30 and at n.3 and n.8]

166. Equally, by comparing relevant sections of *The Red Tattoo* to subsequent work *Off the Map*, there is every appearance that (despite *37 CFR § 201.2(d)(2)(ii)(C)*) DWT, et.al. and FOLEY, et.al. also *'published' The Red Tattoo*, by sharing this sealed and unpublished manuscript with RHIMES, ABC-Disney, and TOUCHSTONE who subsequently shared it with non-defendant Jenna Bans (among others) all of whom infringed it *(see: Feldman v. Shonda Rhimes, et.al. (14-12030, pending).*

## XI.   Harassment

167. FELDMAN advised the panel of mis-goings-on at her home during litigation – stated that on Dec. 4, 2011 she waited for her garage door to come down before driving away (that it was closed) but was open upon her return *("systematic harassment [], including breaking into and entering [plaintiff's] apartment," Batra v. Wolfe, 2010 NY Slip Op 52400 (NY: S.Ct. 2010)).*

168. McCARTER, et.al. entered what appears to be an *eye-witness account* of what occurred at FELDMAN's home – entirely un-couched terms that insist FELDMAN only *"thought she had closed"* her garage [Dkt. 00116353078, 6] which surely is hearsay or harassment as McCARTER, et.al. hardly can speak as to the position of FELDMAN's garage door that specific day when they also insist they are *"not spying on her"* [Dkt. 00116353072, at 2].

169. BR harassed FELDMAN when their Chief Officer came to a book signing to *'purchase'* a book. While this sounds fairly innocuous (on the surface) This Court must note that the signing was *impromptu* – scheduled only the afternoon before – and was a completely unadvertised event that took place inside a "building", in small town, in *another state*, nearly 200 miles away, during a 3-hour window of time.

170. Supporting that this alleged *'purchase'* actually was harassment, the "building" houses only one business – a specialty restaurant – and yet BR's Chief Officer did not purchase food, beverage, or dessert (even *"to-go"*); did not so much as look at the menu or even canvas the music and local art sold there. Instead, BR's Chief Officer looked around for FELDMAN, chatted her up on future work, bought a book, *'grasped'* her, then left.

171. Lest FELDMAN not realize she had been harassed or fail to know by whom, BR's Chief Officer (supposedly on *personal* time) signed FELDMAN's guest register to confirm their identity – leaving their business email "@ brownrudnick.com" (rather than *personal* email).

## XII.  *Oppression and Delay*

172. Counsel repeatedly diverted WOODLOCK's attention from the only material issue in copyright (similarity) – encouraging him to focus on extraneous matters that have nothing to do with similarity; *e.g.* FELDMAN's "dedications" and "acknowledgements" and military status (if any) of book reviewers [Dkt. 53, at 8].

A. *Needless Delay*

173. FOX, BR, and DWT entered the proceeding with a lie: RITVO called FELDMAN scolding her severely for never serving FOX, when FELDMAN already was in return receipt of the Cplt. that FOX had refused. This forced FELDMAN to drive over an hour to RITVO's office (paying $25 just to park) to serve RITVO in person (on FOX's behalf).

174. KORMAN – was twice served at his home with notices to retrieve the Cplt. from the post office. KORMAN failed ever to do so and the Cplt. eventually was returned to FELDMAN.

175. WME2 and KORMAN were served with no fewer than 3 items each at WME2's corporate address (where KORMAN is a managing partner). Despite all items being signed for by WME2's representative, both KORMAN and WME2 insisted they never received anything, or any phone messages from FELDMAN. This oppressed FELDMAN with Default Judgment and numerous other documents [Dkt. 83-84, 90-93, 98-99, 106, 110, 116] against a defense that essentially said: *their dog ate their homework.*

176. UTA properly was served three times, at their proper service address. Three times UTA accepted service and returned the Cplt. unopened, forcing unnecessary delay and oppressing FELDMAN with serving UTA a forth time *at the identical address*.

### B. Fake Writing Awards and Creator Credits

177. McCARTER aided WME2 and KORMAN's entry of fake *writing* awards and *"a host"* of creator credits for FALLS that do not exist. This harassed and oppressed FELDMAN with refuting them lest they stand as true *(emphasis added, below) (ABA Rule 3.4(e)).*

> *"Kevin Falls, the creator of a host of television series, including but not limited to Journeyman.* [Dkt. 95, at 2]

> *"Mr. Falls is an Emmy-winning writer"* [Dkt. 98, ¶13]
> *"the Emmy-winning television writer Mr. Falls."* [Dkt. 97, at 6]

> *"Falls ... appears to be [a] hardworking, highly-compensated, well-recognized writer"* [Dkt. 120, at 3].

178. FELDMAN objected to preserving these false claims in the record [Dkt. 113/115, at 30]. Although McCARTER, et.al. refrained from actually using the word "liar", they distorted FELDMAN's objection then falsely insisted their claims are accurate exactly as stated, offering two different links to FALLS' *production* awards (as a member of a group) which

42

further insinuates they are specifically for *writing* as a solo [Dkt. 120, n.1][Dkt. 141, n.2]:

> *"she contends that Mr. Falls has no Emmy awards."* [Dkt. 120, n.1]
>
> *"it is important to note that Korman's declaration is true and correct ... therefore, Rule 11 has not been implicated* [Dkt. 141, n.2]

179. It must be presumed that McCARTER, et.al. utilized their own links and visited the web-site they referenced, to confirm that FALLS did not then (and still does not) have any awards for *writing*; that (save *Journeyman*) FALLS never created any TV show that aired; and that all professional reviews evaluate of FALLS' writing as 'poor' – *e.g. "NY Times" "Washington Post" "Rolling Stone"* [see: Pltf. Ex F] which WME2 and KORMAN well-knew as FALLS' agent (for the 8 prior years) and his current agency. *(McMunn, 191 F. Supp. 2d 440, 461 (2002); Scholastic v. Stouffer, 221 F. Supp. 2d 425, 444 (2002).*

180. This means McCARTER's mis-characterization of FELDMAN as a "liar" was the actual lie.

## C. Loss or destruction of Important Court documents

181. As a novice *pro se* FELDMAN erred *(in the initial)* by not signing one of her earliest documents upon filing it. Judge Collings so informed her and she returned to the courthouse on June 26, 2009 and signed it, which the document itself *'could'* confirm.

182. On June 26, one or more of the defendants refused Judge Collings and (on June 30, 2009) WOODLOCK was assigned to *Feldman v. Fox, et.al.,* meaning that the onus was on WOODLOCK to docket FELDMAN's signed document.

183. However, he failed to do so and equally failed to produce this document at the Int'l Sch. Conf. (on Sept. 1, 2009) to prove that it is signed, thus aiding counsels' 3-year debate over signage and abetting turning his own court into a three-ringed circus:

> *FOLEY* – *"Plaintiff failed to sign the included verification and jury demand. To date, Plaintiff apparently has not filed a signed version of the Amendment."*
> [Dkt. 43, n.2] (July 31, 2009)

*FELDMAN* – *"My failure to sign the Amended Complaint on June 19, was an oversight ... on June 26, [] I resolved the issue of the unsigned document"* [Dkt. 80/81, at 2] (Sept. 1, 2009)

*WOODLOCK* – *"the amended complaint she tendered ... was unsigned" (Feldman, n.1)* (July 13, 2010)

> *DWT* – *"the "Amendment to the Complaint" was never signed,"* [Dkt. 00116353397, at 8]   (March 27, 2012).

184. Although such frivolous delaying *'tactics'* against *pro se* are not new to WOODLOCK, as the judge in *Feldman v. Fox* (rather than counsel) he was ban from fostering any trial tactics:

*Quoting Judge Liacos on WOODLOCK (as Atty. Woodlock vs. pro se Bernard Borman):*

> *"a review of the record ... shows that the parties have spent an undue amount of time on preliminary maneuvering prior to trial. Such tactics have consumed almost three years ... causing needless expense and delay, [and] unduly infringe[d] on the time of the courts." (Borman v. Borman, 393 NE 2d 847, n. 26 (Mass: SJC 1979))*

185. By the time FELDMAN *finally* learned she was entitled to re-review her *hotly contested* supplement (spring 2012) she also discovered that WOODLOCK never forwarded it at appeal (which the docket itself confirms) [Dkt. 150-1, at 16] and that he either hid it, lost it, or destroyed it some time prior to Sept. 3, 2010.

186. Where WOODLOCK quoted from this document, he clearly received it. Where he never returned it to the records room for forwarding at appeal, it can be only WOODLOCK who hid, lost or destroyed it, which prearranged for FELDMAN's *inability* to prove that she sign it.

187. This Court would be hard-pressed to find greater oppression of any unrepresented plaintiff or a more frivolous waste of Court time and resources than WOODLOCK fostering 3-years of argument over what date FELDMAN signed a document, when he easily could have produced it at the Int'l Sch. Conf. and ended this *Red Herring* battle immediately.

188. Although document destruction; *Red Herrings;* and delays are not (on their own) vitiating fraud, harms such as these plagued nearly every facet of *Feldman v. Fox* and painted

FELDMAN as a full-blown crank.

## *XIII.  Judicial Harassment*

189.  WOODLOCK claimed taking action in the case on June 22, 2009 *(Feldman, n.1)*, despite
not being assigned to it until June 30 [Dkt. 24][Dkt. 25] thus one of three things happened:
(1) on June 22, WOODLOCK signed into ECF with Judge Collings' user name and password
[see: Dkt. 150-1, at 10, Pt 3]; or (2) more likely, is so confused that he has no concept of his
own actions; or (3) equally likely, was so bent on dismissing FELDMAN that he took credit
for the actions of another judge.

### *A.  WOODLOCK badgered FELDMAN (at the Int'l Sch. Conf.)*

190.  There is no debating that First Circuit rule of law *requires* a comparison of the actual items;
or that copyright law holds that the items themselves are "relevant evidence"; and that
defendants' say-so isn't any more *"evidence"* than FELDMAN's say-so.

> *"the works themselves, not descriptions or impressions of them, are the real test
> for claims of infringement"* and *"the works themselves supersede and control
> contrary descriptions of them" (Walker v. Time Life, 784 F. 2d 44, 49, 51 (2nd
> Cir. 1986); see also: Johnson v. Gordon, at 18-19; and Nelson v. Grisham).*

191.  Just the same, WOODLOCK badgered FELDMAN (an unrepresented plaintiff) voluntarily
to exclude the only "relevant evidence" there is in copyright (the actual items); to abandon
her own interests; and relinquish her right to due process *(Johnson v. Gordon, at 18-19).*

> WOODLOCK: *"Okay.  Well, are you prepared to let me resolve this on the papers
> themselves that were submitted?" (Min., Int'l Sch. Conf.)*

192.  FELDMAN clearly balked at court reliance on the litany of fabrications within the
defendants' pleadings [Dkt. 79/81][Dkt. 80/82][Pltf. Ex E][Chart #4] *(Rule 801-803)*:

> MS. FELDMAN: *"I'd like to compare the documents themselves [the books] to the actual
> episodes for a scene-by-scene replay of exactly what occurs in my novels."*

193.  Surely, WOODLOCK using the judgment to *'corroborate'* counsels' list of fabrications

and enter *'facts'* he invented himself [Chart #4] confirms the defendants had WOODLOCK's

willing participation in the scheme to defraud his own court and the Circuit Court after him.

> *"It [i]s well established [] that fabricating incriminating evidence violate[s] constitutional rights." (Kingsland v. City of Miami, 382 F. 2d 1220, 1232 (11th Cir. 2004); Hinchman v. Moore, 312 F.3d 198, 205-06 (6th Cir. 2002) citing: Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir.1989)*

194. Considering the extent of fabrications *attributable* only to WOODLOCK (that do not

appear even in defendant pleadings) it is a reasonable presumption that WOODLOCK is the

source of all fabrications, even those that currently *appear* attributable to counsel [Chart #4]

*(see also: Feldman v. Fox, at 360-362)*.

195. FELDMAN here moves for Oral Argument to sort out fact from fiction.

## XIV. Foman v. Davis – Abuse of Discretion

196. As a judge in the First Circuit, surely WOODLOCK well-knew that *Foman v. Davis* was

overturned *(292 F. 2d 85 (1st Cir. 1963))* because both *Foman* courts failed to offer Lenore

Foman any opportunity to file a *"curative amendment"* before dismissing her with prejudice

*(Foman v. Davis, 371 US 178, 83 S.Ct. 227, 9 L.Ed 2d 222 (S.Ct. 1962))*.

197. At the same time *Feldman v. Fox* was pending in WOODLOCK's court, he also was

hearing *Davis v. Middlesex Sheriff (C.A. No. 09-11453-DPW (2010))* where he duly noted

that Davis was uncooperative; that he had been M-I-A for over nine months *(Davis, n.2);* and

did not request amendment. However; on May 20, 2010, WOODLOCK *sua sponte* granted

Davis 42 days to amend his Cplt. as it was vulnerable under Rule 12(b)(6).

198. By all accounts, FELDMAN was cooperative and immediately complied with every court

order – returned to the court to sign her document; filed Default Judgment and redacted

versions of all sealed documents within the time-frame WOODLOCK allotted to her.

199. Although WOODLOCK knew enough to *freely offer* amendment to the uncooperative and M-I-A Davis, he prejudicially withheld amendment from the cooperative and present FELDMAN *(Foman, at 182 (S.Ct. 1962))* which is directly contrary to the "*mandate*" that he *freely give* leave to amend for technical errors that make a Cplt. vulnerable under Rule 12(b)(6) [see also: Dkt. 42/43] [Dkt. 53/56][Dkt. 96/97][Dkt. 122/124] *(Alston v. Parker, 363 F. 3d 229 (3ʳᵈ Cir. 2004); Foman v. Davis, 371 US 178 (S.Ct. 1962))*

200. As *pro se,* FELDMAN did not know pre-judgment what *"curative amendment"* is or how it works. And, did not learn until reading the judgment that WOODLOCK relied on facts he invented himself. FELDMAN did not learn until nearly a year post-judgment that NEWS was abusing the court system by using at least two other Federal courts to conceal evidence from her and needed to state a claim in WOODLOCK's court.

201. On Motion, WOODLOCK abused discretion by refusing even to acknowledge NEWS' corrupt use of other Federal Courts to conceal evidence from FELDMAN and again refused to offer her *"curative amendment".*

> *"[O]utright refusal to grant the leave without any justifying reason [] is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." (Foman v. Davis, 371 US 178, 182 83 S.Ct. 227, 9 L.Ed 2d 222 (S.Ct. 1962)).*

## CONCLUSION

202. That WOODLOCK made his own and his co-defendants' fabrications an integral part of the judgment is a "constitutional violation[ that] def[ies] harmless-error review [as it is] a defect [that] affect[ed] the framework within which the trial proceed[ed], rather than simply an error in the trial process." *(Neder v. U.S., 527 US 1, 8 (S.Ct. 1999))*

203. While the law holds that infringement is tested by comparing the actual works to each other, WOODLOCK held FELDMAN to a standard never intended by the law – namely, that she

47

demonstrate similarity by citing in her own works the list of *'fake facts'* that WOODLOCK and his co-defendants invented just for court [Chart #4] – a standard so prejudicial it is suicidal to copyright law, as no work ever could meet such muster.

204. This Court must find that FELDMAN was stripped of her every civil right; was deprived of any opportunity fairly to present her case; and suffered a gross miscarriage of justice that resulted in a judgment so fundamentally unfair that it damaged the judicial system in ways that extend far beyond FELDMAN (as an individual *pro se*) *(Johnston v. Holiday Inns, 595 F 2d 890, 894 (1st Cir. 1979); Jentz v. Conagra, SD Ill. 2013); Morgan v. Bennett, 204 F. 3d 360, 367 (2nd Cir. 2000))*.

205. Where such *'defects'* "infect[ed] the entire trial process … [they] "necessarily rendered [the proceeding] fundamentally unfair."" … Put another way, [FELDMAN was] deprive[d] of "basic protections" … thus the error[s] contribute[d] to the verdict obtained. [Such flagrant e]rrors are so intrinsically harmful as to require automatic reversal.*" (Neder v. US, 527 US 1, 7-8 (S.Ct. 1999))*. The defendants motions for (and grant of) sanctions against FELDMAN for *complaining about it* also "requires automatic reversal." *(Neder, at 7-8)*.

206. *Feldman v. Fox* invited every monied defendant to commit crimes in Massachusetts where (if they withhold material evidence until after judgment) WOODLOCK will turn a blind eye then fail to investigate even when the fraud is discovered. *("an affront to the court as an institution", In RE Tate v. Citimortgage 09-0039-WS-M (SD Alabama (2010))*.

207. At least as far back as 1878 and *Throckmorton*, fraud such as that in *Feldman v. Fox* has vitiated every thing it touched and *"whatever it touche[d]"* including judgments obtained by fraud or that rely on fraud. *(United States v. Throckmorton, 98 US 61, 65-66 (S.Ct. 1878))*.

> *"[T]he general rule that [courts] would not alter or set aside their judgments after the expiration of the term … has not meant [] that a judgment [is] completely immune*

*from impeachment after the term. ... [T]here has existed alongside the term rule a rule of equity to the effect that [based upon]... after-discovered fraud, relief will be granted against judgments regardless of the term of their entry ... devitalize[ing] the judgment even though the term at which it was entered had long since passed away."*
*(Hazel-Atlas, 322 US 238, 244-245, 54 S Ct. 997, 88 L. Ed. 1250 (S.Ct. 1944)).*

208. "[O]ne guilty of fraudulent acts cannot escape liability ... by saying that [their] fraud could

have been discovered with ordinary care." *(Stonecipher v. Estate of Butts, 591 SW 2d 806,809*

*(Tex: S.Ct. 1979)).* WOODLOCK, too, is on the public record condemning in others what he

(himself) did to FELDMAN *(Davis v. Middlesex Sheriff (see: below))* and as holding with

other courts that all must be held liable for depriving others of their civil rights:

*"whether through direct participation or though conduct that amounts to condonation or tacit authorization ... 'those individuals who participated in the conduct that deprived [a] plaintiff of [their] rights can be held liable' under §1983."*

*see C.A. No. 09-11453-DPW at Pt. D, ¶2 (2010) citing Velez-Riviera v. Agosto-Alicea, 437 F.3d 145, 156 (1st Cir 2006) quoting Cepero-Riviera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005); and Pinto v. Nettleship, 737 F.2d 130, 132 (1st Cir. 1984)).*

209. This instant Court has the ability and duty to reverse injustice that "a new suit may be

sustained to set aside and annul the former judgment [], and open the case for a new and a

fair hearing." *(U.S. v. Throckmorton, 98 US 61, 66 (S.Ct. 1878)):*

210. FELDMAN urges This Court to adhere to spirit of *Throckmorton;* follow WOODLOCK's

recommendation; and hold all instant defendants (including WOODLOCK) liable for

corrupting the courts and depriving the most vulnerable of citizens (an unrepresented

plaintiff) of their civil rights.

*"[W]here, by reason of something done by the successful party to a suit, there was in fact no adversary trial ... [because] the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent [and their] attorney ... [who] connive[d to] defeat [him] ... there has never been a real contest in the [] hearing of the case, [and] a new suit may be sustained to set aside and annul the former judgment [], and open the case for a new and a fair hearing." Throckmorton, at 65-66).*

49

## FIRST CLAIM FOR RELIEF

211. Reversal of sanctions against FELDMAN. Sanctions against the instant defendants.

## SECOND CLAIM FOR RELIEF

212. Vacate the judgment and remand for new and fair trial on the merits of <u>actual similarity</u>

## THIRD CLAIM FOR RELIEF

213. *"Curative amendment"* – *"a pro se plaintiff [] deserves an opportunity to offer a curative amendment before the complaint is dismissed with prejudice (Smith v. Knox County Jail, 666 F. 3d 1037, 1040 (7th Cir. 2012); see also: Foman v. Davis)*

*Dated: May 25, 2024*
*Respectfully Submitted,*

Debra Feldman, *EA, MIS, BFA, pro se*

## **JURY DEMAND**

Plaintiff demands a trial by jury upon all issues, to the fullest extent permitted

under applicable law.

Dated: May 25, 2014
Salem, Massachusetts

By: *Debra L. Feldman*

Debra L. Feldman, *EA, MLS, BFA, pro se*

## **VERIFICATION**

I am the named Plaintiff in the above-captioned action. I have read the foregoing

Complaint, and know the contents thereof. The same is true of my personal knowledge, except

for those matters which have been stated herein on information and belief, and as to those

matters, I believe them to be true.

I declare under the penalties of perjury of the United States that the foregoing

is true and correct.

Dated:   May 25, 2014
Salem, Massachusetts

By:

Debra L. Feldman, *EA, MIS, BFA, pro se*